I was going to add, I would suggest that. May it please the Court. My name is Diane Valancourt and I represent the Plaintiff Appellants Sharla and Dustin Kahn. And I'd like to try to reserve a couple minutes for rebuttal. In this matter, appellants maintain that they've set forth an issue of fact over two main issues. Fourteenth Amendment, the question whether the officers, Ashton and Robertson, may be excused for their failure to report Brenda Saluska's suicide attempt and threats that they witnessed or take her to a hospital because they thought she was manipulating them. The second main issue, causation. We maintain that we have set forth an issue of fact, whether that Brenda Saluska could have been saved and not killed herself had the officers only reported her suicide attempt and threats to appropriate authorities at the jail or taken her to the hospital, where she would have received suicide assessment and intervention by mental health professionals trained to intervene in suicide. The defendants have made several admissions, and I'd like to run through them very quickly to, with regard to the first issue, the Fourteenth Amendment. They admitted they saw Brenda Saluska wrap the paddy wagon seat belt tightly around her neck and that it took both of them to remove her clenched hands from around the belt and to unwind the seat belt from around her neck. They admitted that. This happened when they, when she realized she was going to go to jail? That's right. This happened when they, she realized that they had lied to her, saying that they would take her home to retrieve her belongings, and that's how they cajoled her into getting into the paddy wagon. And when she realized that, no, they had lied to her, this impaired woman became what the defense, the defendants even admit, they knew she was emotionally distraught. They recognized that she tried to hang herself in the wagon. They believed that she could have passed out from the seat belt choking. So they actually believed that she could have harmed herself. They deny that they believe she could have actually killed herself by wrapping the seat belt around her neck. But to me this is indifference to a very serious risk of self-harm. And she actually succeeded in choking herself with a sheet less than 48 hours later. They heard her. They admit they heard her repeated threats to kill herself, screaming, kill me or I'll kill myself then. They admitted they did not think she was joking. They admitted they knew she was emotionally distraught, that she knew she had a history of mental illness from the Watson warrants check. And they talked about it and decided not to report the incident to jail officials. Ashton admitted to a sheriff's deputy when he found out that Ms. Saluska had killed herself that they did not report what was framed as the suicide attempt. And yet they deny that she attempted suicide. Ashton admitted that in the event of a suicide attempt, they knew they were required to take the person to a medical facility for an evaluation. Ashton admitted they knew they were also required to report all suicide attempts and it's not a matter of discretion for the officers to decide whether or not to report a suicide attempt. Robertson admitted it would have taken five seconds. It would have been so easy to report what they witnessed in the paddy wagon. And finally, on finding out, happening to be at the jail as Ms. Saluska succeeded in killing herself, Officer Ashton remarked to a sheriff's deputy that his sergeant would be pissed that he and Officer Robertson had not reported the incident. If that's not an indicator of awareness of culpability, it's hard for me to imagine more. Let me just ask you a question. Yes. The question of causation is close for me. Yes. And since the defendant said the intake people don't keep records anyway, jail doesn't keep documentation on people who were in civil protective custody, why shouldn't we find that the defendant's actions were not a but-for cause of her ultimate suicide, particularly in light of the fact that patients are evaluated on their mental state at the time they're brought in. She didn't kill herself on the 26th. Why should we find that the medical staff would have kept her longer, especially given that she was similarly released only a day before? All right. Well, first of all, Officer Ashton testified, he admitted, that if he recognized this as a suicide attempt, he knew he should have taken her to the hospital on a legal 2000. That's Nevada's 72-hour hold procedure for people at risk of suicide. So he admitted he knew that. That's one route that would have saved her. There she would have received the suicide assessment and intervention until she was deemed no longer at risk of harm. She wouldn't have even gone to the jail for those six hours. Second, had he not done that, had they not done that, and had they taken her to the jail, Gayle Singletary, prison health services administrator, testified, and she said typically what we do is refuse them. If the jail on a civil protective custody is advised that somebody has made a suicide attempt in threat, they refuse them because they don't provide medical care to these people. And she said typically we refuse them and we ask that they be medically and psychiatrically cleared. So, again, that route would have taken Ms. Zaluska to the hospital where she would have been assessed and protected and her suicidal ideations addressed. Her medical need, let me make sure I understand. In your view, her medical need was that she was suicidal? Is there anything else that was apparent? She was suicidal. She was impaired with Xanax. She had alcohol problems. These were her medical needs. She was spiraled and actually yes, but on the basis of what was known after that first episode, what would the medical need must have been that she was suicidal? And that is what we are claiming. So you mentioned that at the time she was brought in that she was assessed for, she was assessed, medically assessed when she was brought in for civil protective custody. Review of those records show that all they did was simply ask a question. Have you considered suicide? Did you threaten suicide? That's it. That's the extent of the assessment she received when she went into civil protective custody. And again, prison health services director, Gail Singletary, testified that had they been made aware of the fact that she had threatened suicide, they would have done a more thorough assessment. Would have asked her more questions. Even admitted her.  Meanwhile, Ms. Singletary also allowed that she might be admitted on civil protective custody. That does not seem likely because they do not do medical intervention on civil protective custody. So the more likely scenario is that she would have been sent to the hospital where she would have received appropriate intervention and been safe. And then you mentioned that she did not kill herself during those six hours in civil protective custody. But what was foreseeable is that she was at risk, and that risk was never addressed. It's like the officers, imagine, you know, I hold a loaded gun in my head and the officers come and they pull the gun away from my head, okay? But they don't take the gun away. They leave me with the gun. And that could go off while she's in custody. That could go off later. She's got this loaded gun that hasn't been taken away from her. Her suicidal ideation was never addressed. Had it been addressed, she would have been safe in a hospital or mental health facility until the doctors and mental health professionals deemed her no longer at risk of harming herself. And because she remained on the street without any suicide intervention, she remained at risk of self-harm. I would like to address the officer's defense that they had discretion to ignore her suicide attempt and threats because they saw it as manipulation. And I brought a case out of the Western District of Wisconsin. It is 525-FSUC-2D. 1076, which is a very thoughtful decision by Judge Barbara Crabb analyzing the role of manipulation. What does it mean when an officer thinks somebody is not really committing suicide, they're just trying to manipulate? And what Judge Crabb pointed out is it makes — it really makes no difference whether they're trying to manipulate or not is irrelevant. It doesn't take away from the danger. I mean, imagine somebody standing on the edge of a roof and threatening to jump. And the officers are down there, and they see this person standing on the roof, and they say, oh, we don't have to do anything because they're being manipulative. There's a real difference between the danger that is present, standing on the roof or holding a gun against your head, and the reason you're doing it. And it's just not a legitimate reason to say, oh, we're not going to do anything because they're being manipulative. And what was she being manipulative about? She was trying to help. It's not a question of fact anyway, whether they thought she was being manipulative. Exactly, Your Honor, and that's our point. It's a question of fact, and the lower court ruled on it as a matter of law. And I've reviewed lots and lots of appellate cases, and I do not see a single case that is ruled as a matter of law that officers are entitled to not report suicide attempts or threats that they witness. And the cases cited by the defendants, the Snow case, the Cartwright case and the Cook case, do not stand for that proposition. In fact, they stand for the very opposite. In the Snow case, the officer summary judgment was reversed, and it was remanded for trial because there was an indication in the record that the officer had been advised that the person attempted suicide. Well, here, I mean, it's not a question of negligence. Is it? Is this a question of deliberate? Doesn't there have to be a showing of deliberate indifference here that caused the suicide? Well, Your Honor, that isn't as easy a question as it would seem because the deliberate indifference standard is the baseline. It's not the standard. The standard out of Youngberg is that she was entitled to more considerate treatment than would be someone who had been convicted of a crime. There's a balancing in some cases. And then, again, in the Youngberg case, the Supreme Court talked about an exercise of judgment. You know, how far does this deviate from an exercise of judgment to the point where there is no judgment exercised? Well, it's a little more complicated than that, and there certainly isn't time in your last minute and a half, because it may be one of the issues you'd have to confront ultimately is whether you need deliberate indifference if you're going to say it's enough for qualified immunity purposes to apply a lower standard. But there's not you've got a minute left, which you probably want to say. Your Honor, Youngberg's been around a long time, and I'll reserve the remainder of my time. Thank you for the reminder. Good morning. Donald Christensen on behalf of the defendants and appellees in this case. If I could start by talking about the causation issue, because I believe that's the biggest hurdle that the plaintiffs in this case have to overcome. There's two aspects to that, first of all. There's actual causation, obviously, and proximate cause. First, I'll talk about the actual causation issue, if I could. Now, at 930 on the morning of April 26th, Dr. Kaplan, the psychiatrist at the Mental Health Institute, found that Brenda Kluska was not at risk for suicide, and he released her. It was just five hours, less than five hours later, that she engaged in the conduct that's the issue in this case in the back of the transport vehicle on the way to the jail. So didn't that prove the doctor was wrong? Is that still unusual? Well, sort of an interesting, interesting question. How do you think he would have evaluated her had he known that she had actually tried to commit suicide? Well, she had done that just the day before. That's why she was at the Mental Health Institute. She had threatened to commit suicide with medication overdose, and that's why she was there. And then, if she, six hours later, she tried it again, tried to hang herself, do you think that might have changed his opinion? We don't know. And he doesn't know. And what he says is that both the doctors that were, their depositions were taken in this case, the emergency room doctor, Dr. Gansert and Dr. Kaplan, both say that what they do is they look at all the circumstances then presented to them for a particular evaluation. They don't necessarily look back at history. They look at the circumstances then. They discuss it with the patient. I mean, those doctors aren't interested? They wouldn't be interested in the fact that this was the second attempt within 24 hours or so? They only want to know about the one that occurred most recently? I'm just, I'm sure they would like to hear about the current. What they say is that they assess it every time. Well, I'd like to find out about those doctors if they're not interested in the fact that she tried twice after they decided the first time that she wasn't a risk. They say that wouldn't have affected their decision? They wouldn't have wanted to hear about the first time, only the second? There's two questions there. I think, number one, would they want to hear about it? Sure. It's part of their assessment. But the second thing is just simply speculation, as they testified in their depositions that they don't know what result they would have reached. They look at all the circumstances then presented. If I could, it's an interesting aspect of the appellant's argument as far as Dr. Kaplan's assessment at 930 on April 26th that she was not suicidal, and then five hours later, plaintiff says that she attempted suicide. Well, the other side of their argument is that if she'd gone back to the Mental Health Institute, that somehow she would have been protected from suicide for some 8 to 24 months. I don't see how you can have it both ways. Either there really wasn't a suicide attempt because she had been somehow now protected for the 8 to 24 months after being at the Mental Health Institute, or if you go back there, it really doesn't prevent that sort of behavior again. It's part of what their argument is, that if she would have gone back and got treatment, this wouldn't have occurred. Is your argument that these doctors weren't competent, and therefore she wouldn't have been protected? No. I don't think that's the argument here. It's just simply that their argument is that if she'd gone back, then she would have been somehow protected for, they say, 8 to 24 months. But on the other hand, they say she attempted to commit suicide five hours after she was released from the Mental Health Institute. You can't have it both ways. Their argument is that twofold for, well, Dr. Kaplan's view, he was asked, what do you think happened that she committed suicide two days later after your determination on the 26th? His view is that her situation must have changed and her state of mind. And it did. After he released her on April 26th, there was a protective order actually served against her. She violated that protective order and was arrested. She was looking at some substantial jail time. She'd gone in to the judge that morning at the arraignment, specifically got her upset. She wouldn't he wouldn't want to listen to her side of the story at the arraignment. The police officers at the jail wouldn't let her make a telephone call that she deemed important to make. Her situation did change. It changed that way. And that's what he believes occurred in the two days between. There are two arguments. Their arguments are these, though, on causation, I think. One, if you would have taken her to the if you would have informed the jail personnel, then they say this is what the jail personnel would have done. They would have observed her, and then during the four hours she was there for the CPC and made some determination after that as to what to do. But presumably have taken her to to the emergency room and et cetera. First of all, the the undisputed evidence is that the jail personnel have the right to refuse her if they knew that she was suicidal, if they actually knew that. And then you send her to the emergency room for evaluation. And what had happened before in the emergency rooms out of the four times we know of that she'd gone to the emergency rooms and then, or excuse me, four times before April 26th she'd gone to the emergency room, is that three of the only three of those times was she then sent on to the Mental Health Institute. And on each occasion, on the first time she's kept less than 12 hours at the Mental Health Institute, one time she's kept one day, the third time she's kept 17 hours. Every time they discharged her when they found she was no longer at risk for suicide. And that's what they do. They're not there. There's no cure. They don't do some magic cure, dip her in some magic waters and say now you're won't have a suicide risk. They let her go when she's not at risk then. And what happens in the future, who knows. Every time they make a recommendation for outpatient counseling for her, there's no evidence that she ever followed any of those. It's undisputed that she's had substantial substance abuse issues also. The second argument. Well, let me just ask, the question would be is she of danger to herself or others? Wouldn't that be influenced by a knowledge that she had attempted to choke herself? Would it be? What the physicians both said in their depositions is they just, they look at all the factors then when the person is presented to them for evaluation. Is that something that they would consider? I assume that they would. But they don't know exactly what that determination would be until they do it. And it's just purely speculation to decide what it is. When she tried to choke herself in the paddy wagon, was she drunk? Yes. That's why she was being taken. She was taken in on civil protective custody. And when she hung herself in the jail, she was not drunk? No. She had been arrested. There's no indication in the arrest on April 27th of any involvement of alcohol or overdose of medications as there had been on all her prior instances. Prior instances, she had attempted to cut her wrist on two occasions. The other two occasions, she was, either had taken an overdose of medications or was threatening to do the same. It was a very different situation. So what I'm saying with respect to the prior, if you had taken her to, for the hospitalization, they'd only kept her a short time, a day at the most, on all the prior ones. And when you cut, and they don't know this. All they do at that time is that at the time of the release, they determine that you're not currently at risk. And so the same thing, like I'm saying here, is that the same thing could have occurred even if she had been taken for this medical evaluation. They would have observed her. They'd never kept her more than a day. They determine whether she currently is at risk, and she leaves. The same things could have occurred. That's if they determine she's no longer at risk, right? Yes, sir. And the question is, if a day after they decided she wasn't at risk, they were told she tried to kill herself again, whether that might, even in this hospital with these doctors, even there, that they might have decided there was a more serious problem than they thought. That's the question. But they don't. But the same things have been presented to them every single time in the past. What, that she had tried to kill herself within the same day after which they decided she's not at risk? Maybe they'd be worried about malpractice. Not in that sequence. But every single time she had just been presented on an attempt to kill herself is what had occurred in the past. And she was kept no more than one day on each of those occasions. If you had been ‑‑ if the jail personnel had kept her, I mean, she had been there just the month before in the jail on a separate misdemeanor charge. On March 20th, preceding this April 27th when she was arrested again, they had put her on a suicide watch already at the jail. I mean, on that suicide watch, they'd kept her for about four days at the jail. It was Washoe County Jail, not City of Reno Jail. There is no such thing. But during that time, all they did was keep her on suicide watch for a little bit of, for these four hours. They didn't give her any kind of psychological assistance or psychiatric assistance during the time she was kept there. They didn't send her out for anything further. They just kept her in jail for almost another month. So what I'm saying is if you took her to the jail, if you had informed the jail of this occurrence on April 26th, there's no reason to believe that the jail would have done anything more than it had done before. Kennedy. Well, I thought there were instructions. The counsel said that there was ‑‑ there are instructions they receive that if she's suicidal, it's supposed to take her to the hospital. They have the right to refuse her admission at the jail if she's found suicidal on admission, which would send us back into this evaluation period, which in the past hadn't prevented, presented, prevented, excuse me, other suicide attempts also. You're saying it's ‑‑ in that hospital, there's no point in sending anybody who was going to commit suicide. No, I'm not saying that. What I'm saying, they do their job, which is to keep a ‑‑ to assess, evaluate and treat as necessary up until the point that the person is no longer actively suicidal. And in the past, that had been the most that ever kept her there is one day. In fact, in the one on April 26th when she was released, she wasn't even suicidal the day before when she arrived there on April 25th is what the testimony is with respect to the Mental Health Institute. What the district court said was the harm presented by the facts of this case is the suicide. The failure to provide Klutzke medical attention for about six hours while she was in CPC resulted in no harm. Klutzke did not injure or attempt to injure herself while in CPC. Is that correct? That's correct. Nor did she try to harm herself upon release. Is that correct? That's correct. And it says, moreover, after release but before her subsequent arrest, she was evaluated on two separate occasions, once by a CPC intake nurse and the other by WMC professionals. And I assume they did not and they found that she was not? Not at risk. One of those, the WMC is an emergency room physician. In addition to that, when she was arrested on April 27th, she was again assessed by the intake nurse for misdemeanor admissions and was not found to be at risk. Since your time is running out, I'd like to ask you a question about your assertion that there's no genuine issue of fact as to the officer's subjective beliefs. Doesn't Ashton's comment, particularly the discomfort he expressed the day after the incident, raise a question as to his state of mind at the time? And which comment? He said he felt guilty or something about not reporting this incident, that his captain would be mad at him if he, you know, he said, don't report it. And then the next day, he said he felt that he should have reported it and his captain would be mad at him, but he was going to report it anyway. I think you're referring to his sergeant instead of his captain. But his sergeant did testify in his deposition. What he said is that there's what he does like to know about unusual occurrences. Is this unusual? Yes. Did it indicate, was it a, what's my magic words here? The, excuse me, the, were they deliberate, does it show deliberate indifference to a serious medical need? No, I don't believe so. His sergeant said there wasn't, there was no other need to report it other than he does like to know about unusual occurrences. So I don't think necessarily it shows deliberate indifference. It shows this gentleman, that officer, Officer Ashton, was a probationary officer. He was new. He always wanted to do what his sergeant wanted him to do. He was in that sort of a period. So I don't think it shows deliberate indifference. Just, if I could go back to the prox, do you have a? Yeah, no. Proximate cause? He should have reported it. Well, should have, you know, that sort of assumes that this really was a real suicide attempt. Neither of the officers really believed that it was. I know, but if you assume that he should, that it was, and he should have reported it. Yes. The real problem here is that, was the failure to report, was there any causal link between the failure to report it and the suicide? That's exactly, that's exactly the biggest question here. And the other aspect of the causation, of course, is the, was it the proximate cause also of the suicide? And the proximate cause is ordinarily determined by the original foreseeable risk that's created by the defendant. I mean, the foreseeable risk here, if there was one, was that she would commit suicide during the time she was confined for the purpose for which they were transporting her, which was CPC. I mean, there's no. Why is that the only foreseeable? The foreseeable risk is that she will commit suicide. But. You know, if you take, if you don't take her to the hospital, whether it's in jail or when she gets out of jail a few hours later. But how far down the line do you hold them responsible for something like that? Well, at least a day or so later. Well, but they don't want to have that cut off in any, any manner at all. It doesn't matter what their, how long it may be. They'd say months or what? We're only talking about a day. Is it foreseeable in a day she's going to commit suicide? Well, the situation had changed just as Dr. Kaplan, the psychiatrist, said. Her situation had changed substantially and her state of mind had changed substantially. She went in and out of these sorts of things. She was not always in a suicidal ideation period. It came and went. Well, it's also foreseeable that unless there are unforeseeable events that occurred, there's nothing unforeseeable about what occurred between the time she tried to kill herself in the car and the time she killed herself. The unforeseeable was that she went through several medical evaluations. She was not in a suicidal ideation period. How long do you hold someone responsible for what occurred like this, for not reporting when it was not the cause of it? Well, at least 24 or 48 hours, I think. All right. Thank you. Thank you. We can never say with 100 percent certainty what would have happened. But what we are saying is that there is an issue of fact here for the jury to decide. We maintain she would have received appropriate suicide assessment and intervention and was deprived of that by these officers. She would have if what? Had these officers taken her to the hospital or reported her suicide to jail authorities, either road would have led to appropriate suicide assessment and intervention by the hospital, because jail authorities would most likely have rejected her and sent her to the hospital. Psychiatrist Kaplan testified that Ms. Saluska's recent suicide attempts days earlier would have been flagged, had she received that assessment, and set off alarm bells. None of the medical providers that saw Ms. Saluska had any idea that she had just within the last 24 hours threatened to kill herself and that she had actually made a suicide attempt. None of them. If you look at those records, the records are very cursory. Even when she was taken to the emergency room and was seen by an emergency room doctor, it's just a very quick exam. He just took a look at her, wrote down some notes. He wrote that she, for example, has no prescription abuse, and she denied suicidal ideation. That's pretty much the extent of his exam. I thought counsel said that she had been in, evaluated, and released within a day, even though the day before she had tried to kill herself in the emergency room. Is that not right? All right. Well, she had been evaluated several times. I think she was taken on holds like four or five times in the last couple of years, the last four or five years. Each time, with the exception of this last one, she remained suicide-free for a matter of months to two years. I think it was eight months to two years. This last time, once she was released, and I don't know why they released her, obviously, but once they determined that she was no longer at risk of harm, she had a problem. She couldn't go home. Her mother had gotten a TPO out against her. She, you know, she asked these officers for assistance in retrieving her belongings, and they betrayed her. So things changed for her. Things started really spiraling downward, even from where she was when she was released. Does that answer your question, Your Honor? I guess so. Okay. All right. You have used your time. I guess we'll let you use it. Thank you. Thank you. Go ahead. Okay. We'll hear the last case on the calendar, which is Society Seville v. Wren Long.
judges: Schroeder, Nelson, Reinhardt